UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PETER MICHEL,<br><br>        Plaintiff,<br><br>        v.<br><br>LOANCARE, LLC; AND<br>LAKEVIEW HOME SERVICING, LLC,<br><br>        Defendants. | Civil Action No.<br>21-11018-FDS |

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION TO DISMISS

**SAYLOR, C.J.**

This is a dispute concerning the payment of insurance proceeds to a homeowner after a fire. Jurisdiction is based on diversity of citizenship.

On May 6, 2018, a fire occurred in the home of plaintiff Peter Michel, causing serious structural damage, although the home was not completely destroyed. Michel decided to repair the structure, and engaged a contractor to begin work.

A lender, Village Mortgage Company, held a mortgage on the property. The mortgage contract required Michel to maintain property insurance. It also provided that insurance proceeds for "repair and restoration" after a fire or other would be paid to the lender, and would then be disbursed "in a single payment or in a series of progress payments as the work is completed."

On August 8, 2018, the property insurer issued a check for $281,122.07 to defendant Lakeview Home Servicing, LLC, the servicer of the mortgage loan on the property. Lakeview,

in turn, transferred the funds to a sub-servicer, defendant LoanCare, LLC.  LoanCare held the money in escrow and was responsible for disbursing the funds to Michel for the repairs.

The present dispute arises out of LoanCare's alleged failure to disburse the funds in a timely manner.  The amended complaint, among other things, asserts claims for breach of contract and breach of the implied covenant of good faith and fair dealing.  Defendants have moved to dismiss all claims pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.  For the reasons set forth below, the Court will grant the motion in part and deny it in part.

**I.    Background**

For purposes of a motion to dismiss, the court will take the factual allegations in the amended complaint as true.

**A.    Factual Background**

Peter Michel is a resident of Methuen, Massachusetts.  (Am. Compl. ¶ 1).  He and his family resided at 40 Timber Lane in Methuen.  (*Id.* ¶ 5).

On May 6, 2018, there was a serious fire at their home, severely damaging the structure.  (*Id.* ¶ 5).

The property was subject to a mortgage contract between Michel and the lender, Village Mortgage Company.  (Dkt. No. 12, Def. Mot. to Dismiss, Ex. 1).[1]  Lakeview Home Servicing, LLC serviced the mortgage on the property.  (*Id.* at Intro.).  LoanCare, LLC is a sub-servicer for Lakeview.  (*Id.*).

The mortgage contract required Michel to maintain fire and other hazard insurance on the

---

[1] While the mortgage contract is not attached to the amended complaint, the court may properly consider it at this stage because the amended complaint's "factual allegations are expressly linked to" and "dependent upon" it. *See Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 321 (1st Cir. 2008) (quoting *Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 16-17 (1st Cir. 1998)).

property.  It required that any insurance proceeds after a fire or other damaging event be paid to the lender.  It addressed the disbursement of proceeds for "repair or restoration" of the structure as follows:

> During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to the Lender's satisfaction, provided that such inspection shall be undertaken promptly.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.

(Dkt. No. 12, Def. Mot. to Dismiss, Ex. 1, p. 5, ¶ 5).

On July 26, 2018, Michel hired a contractor to begin work on reconstruction and repairs to the property.  (Am. Compl. at Intro.).

On August 8, 2018, the insurer (the Massachusetts Property Insurance Underwriting Association) issued a check for $281,122.07 for the damage to the home.  (*Id.*).  The check was deposited by Lakeview.  (*Id.*)  Michel informed Lakeview that he planned to rebuild his home; Lakeview directed him to contact LoanCare for the release of insurance proceeds and inspections of the property.  (*Id.*).

According to the complaint, Michel contacted LoanCare, "and was advised that funds would be timely released or advanced as needed."  (*Id.* ¶ 12).

In September 2018, the contractor began demolition activities.  (*Id.* ¶ 14).

On November 5, 2018, Michel requested that LoanCare disburse $150,000 for the upcoming work.  (*Id.* ¶ 17).  According to the complaint, he re-sent the request three times, but "never received a response" from LoanCare.  (*Id.* ¶ 13).

By late November, the contractor had completed $38,000 worth of work.  (*Id.*, Ex. G). On November 27, 2018, LoanCare made its first disbursement to Michel, in the amount of $40,000.  (Am. Compl. ¶ 18).

Also on November 27, 2018, Michel requested an additional $150,000. He included an invoice from his contractor justifying the request. (*Id.*, Ex. G). LoanCare did not respond to his request until December 21, 2018. (*Id.* ¶ 22). LoanCare allegedly informed Michel that they had already sent him a check for $80,375.69. (*Id.* ¶ 22). Michel contends that he never received that check. (*Id.* ¶ 23).

On January 8, 2019, the contractor walked off the job "because of the delays caused by the defendants." (*Id.* ¶ 24).

On January 15, 2019, LoanCare disbursed an additional $101,626.55 to Michel. (*Id.* ¶ 25).

Michel hired a new contractor on March 12, 2019, to finish the repairs. (*Id.* ¶ 26). The new contractor only agreed to complete the work if Michel paid its invoices directly. (*Id.*).

By May 2019, the work was more than 50% complete. (*Id.* ¶ 30). Michel then called LoanCare and requested an inspection. (*Id.*). He was told that an inspector would come within three to seven days; however, it took six weeks before an inspector arrived.

The inspector eventually visited the property, and reported that the work was 50% complete. (*Id.* ¶¶ 30-34).

On July 17, 2019, LoanCare released an additional $80,000 to Michel. (*Id.* ¶ 37). At that point, it had disbursed a total of $221,626.55—approximately 79% of the total escrow funds. (*Id.* ¶¶ 19, 25, 37).

On October 20, 2019, the contractor finished construction of the house. (*Id.* ¶ 39).

Michel contacted LoanCare on December 19, 2019, seeking disbursement of the remainder of the funds, which was $59,500.42. (*Id.* ¶ 42). LoanCare informed him that the remaining funds would not be disbursed until he signed a release. (*Id.* ¶¶ 43-44).

The proposed release provided that Michel would "indemnify and hold harmless" LoanCare from any potential liability concerning repair contracts he had entered into during the reconstruction of the property and also that he would be responsible for paying any liens that may have arisen on the property during reconstruction. (*Id.*, Ex. N) (the "Hold Harmless Agreement"). Michel refused to sign the Hold Harmless Agreement. (*Id.* ¶ 45).

About a year later, on December 4, 2020, LoanCare left Michel a voicemail stating that a check had been sent to him for the remaining $59,500.42. (*Id.* ¶ 46). That check, however, was incorrectly made out to the first contractor that Michel had hired. (*Id.* ¶ 47).

After May 13, 2021, after the filing of this lawsuit, the parties worked out an agreement and the final funds were released to Michel. (*Id.* ¶ 49).

**B.     Procedural Background**

On May 13, 2021, Michel filed a complaint in state court. (Dkt. No. 1, Notice of Removal, Ex. 1, Verified Compl.). LoanCare removed the case to this Court. (Dkt. No. 1, Notice of Removal). On July 2, 2021, Michel filed an amended complaint, adding Lakeview Servicing as a defendant. (Dkt. No. 10).

Count 1 of the amended complaint alleges breach of contract. Count 2, which is captioned "agency," alleges an agency relationship between Lakeview and LoanCare. Count 3 alleges breach of the implied covenant of good faith and fair dealing. Plaintiff withdrew his claims under Counts 4 and 5 (conversion and fraudulent misrepresentation, respectively), and defendants do not object to plaintiff's dismissal of those claims. Count 6 alleges unfair and/or deceptive trade practices in violation of Mass. Gen. Laws ch. 93A, §§ 2 and 9.

Defendants have moved to dismiss the amended complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

## II.     Standard of Review

To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).  When determining whether a complaint satisfies that standard, a court must assume the truth of all well-pleaded facts and give the plaintiff the benefit of all reasonable inferences. *See Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Médico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

## III.    Analysis

### A.      Count 1:  Breach of Contract

Under Massachusetts law, to assert a claim for breach of contract, the complaint must allege that (1) a valid contract between the parties existed; (2) the plaintiff was ready, willing, and able to perform; (3) the defendant breached that contract; and (4) the defendant's breach caused the plaintiff damage. *See Netcracker Tech. Corp. v. Laliberté*, 2020 WL 6384312, at *5 (D. Mass. Oct. 30, 2020) (citing *Bose Corp. v. Ejaz*, 732 F.3d 17, 21 (1st Cir. 2013)).

For a breach-of-contract claim to survive a motion to dismiss, the complaint "must do more than allege, in a conclusory fashion, that the defendant breached the contract." *Hogan v.*

*Teamsters Local 170*, 495 F. Supp. 52, 58 (D. Mass. Sept. 30, 2020) (quoting *Alenci v. Hometown Am. Mgt., LLC*, 2020 WL 2515872, at *4 (D. Mass. May 15, 2020)). Instead, it must allege, with "substantial certainty," the specific contractual obligation that the defendant breached. *Id.* (quoting *Alenci*, 2020 WL 2515872, at *4); *see also Buck v. American Airlines, Inc.*, 476 F.3d 29, 38 (1st Cir. 2007) (describing the pleading requirement for breach-of-contract claims under Massachusetts law). In particular, it must "at least" plead facts that identify "who did what to whom, when, where, and why," and explain "what obligations were imposed on each of the parties by the alleged contract." *Hogan*, 495 F. Supp. at 58 (quoting *Alenci*, 2020 WL 2515872, at *4).

The contract at issue here is the mortgage contract, which is between Michel and Village Mortgage. The parties do not appear to dispute that Lakeview was the agent of Village Mortgage, and that LoanCare was the agent of Lakeview. In any event, defendants contend that the breach of contract claim should be dismissed for three reasons: (1) there was no breach; (2) plaintiff was not reading, willing, and able to perform his obligations under the contract; and (3) the complaint does not sufficiently allege that plaintiff suffered any damages. (Dkt. No. 12, Def. Mem at 8-10). Plaintiff alleges that defendants breached the contract by (1) improperly disbursing the funds held in escrow; (2) failing to conduct timely inspections; and (3) forcing plaintiff to sign LoanCare's Hold Harmless Agreement before the final funds would be released.

This Court will address each of plaintiff's allegations in turn. At the outset, however, it notes that the issue is not whether plaintiff suffered financial losses, or had an unhappy experience with LoanCare; the complaint alleges both in considerable detail. Rather, as to Count 1, the issue is a relatively narrow one: whether LoanCare, as an agent for Lakeview (which in turn was an agent for Village Mortgage), breached the relevant contract.

Plaintiff's first theory of breach concerns the disbursement of the insurance proceeds. The mortgage contract permits defendants to "disburse [insurance] proceeds . . . in a single payment or in a series of progress payments *as the work is completed*."  (Dkt. No. 12, Ex. 1 ¶ 5) (emphasis added).[2]  On November 5, 2018, plaintiff requested $150,000 from LoanCare to *begin* construction of the home.  (Am. Compl. ¶ 17).  LoanCare made its first disbursement to plaintiff on November 27, 2018—disbursing $40,000.  (Am. Compl. ¶ 19).  That amount aligns with the amount of work that had been completed; at that point, $38,000 worth of work had been completed.  (*Id.*, Ex. G).

Also on November 27, 2018, plaintiff again requested additional funds of $150,000 to complete upcoming work.  (*Id.* ¶ 19).  LoanCare did not release additional funds until January 15, 2019 (when it released an additional $101,626.55).  (*Id.* ¶ 25).  That conduct, plaintiff alleges, is a breach by LoanCare that caused the contractor to walk off the job, resulting in significant delays and expenses.

The problem with that theory is that the complaint alleges that plaintiff requested the additional funds for work that was *to be* completed, not work that was *already* completed.  (Am. Compl., Ex. G.).  Again, the contract provides that LoanCare is required only to disburse funds periodically "as the work is completed."  (Dkt. No. 12, Ex. 1 ¶ 5).  The first two disbursements represented 50.38% of the total insurance proceeds and were received by plaintiff by January 2019; the house was not 50% complete until May 2019.  Therefore, the complaint fails to plead

---

[2] The Court assumes for purposes of this analysis that to comply with the terms of the contract, LoanCare would need to release a percentage of the insurance proceeds equal to or greater than the percent of the work completed.  Thus, for example, if reconstruction of the house is 25% complete, LoanCare should disburse 25% or more of the insurance proceeds.

The first construction contract was for $283,253.29.  (Am. Compl. ¶ 13).  The second construction contract was for $284,500.  (*Id.* ¶ 27).  The insurer issued a check for $281,122.07.  (*Id.* ¶ 9).

sufficient facts to demonstrate that defendants improperly disbursed escrow funds in November 2018.

Plaintiff's second theory concerns the timeliness of an inspection. The complaint alleges that in May 2019, plaintiff called LoanCare and requested an inspection of the house because it was more than 50% complete. (*Id.* ¶ 30). LoanCare told him that it would take three to seven days for an inspector to arrive, but an inspector did not come until six weeks later. (*Id.* ¶¶ 31, 34). The contract provides that LoanCare can hold insurance proceeds "until Lender has had an opportunity to inspect such Property to ensure the work has been completed . . . *provided that such inspection shall be undertaken promptly*." (Dkt. No. 12, Ex. 1 ¶ 5) (emphasis added).

The complaint plausibly alleges that the inspection was not performed "promptly" in accordance with the terms of the contract. However, even assuming that such conduct breached the contract, the complaint itself alleges that construction was 50% complete at that time the inspection was requested, and LoanCare had already disbursed more than 50% of the funds.[3] And again, the contract permits LoanCare to disburse progress payments "as the work is completed." (*Id.*). Therefore, the complaint insufficiently pleads facts that demonstrate that the untimely inspection caused plaintiff to sustain damages.[4]

Plaintiff's third theory is that defendants breached the contract by forcing plaintiff to sign the Hold Harmless Agreement before the final funds would be released. Defendants contend that the mortgage contract allowed them to require plaintiff to sign the Hold Harmless Agreement before having to release the remainder of the funds to him. And because plaintiff refused to sign,

---

[3] LoanCare disbursed $40,000 on November 27, 2018, and $101,626.55 on January 15, 2019. (Am. Compl. ¶¶ 19, 25). This sums to $141,626.55. The total amount issued by the insurer was $281,122.07. (*Id.* ¶ 9). So, by January 15, 2019, LoanCare had disbursed 50.38% of the total amount held in escrow.

[4] Although it is plausible that Michel could have sustained other damages due to such a delay (for example, expenses related to a delay in construction, if that occurred), the complaint does not so allege.

he was therefore not ready, willing, and able to perform his obligations under the contract. Plaintiff contends that he was not required to sign the Hold Harmless Agreement and that the refusal to release the remaining funds unless he did so is a breach of contract.

The mortgage contract permits LoanCare to require that plaintiff agree in writing to the payment of any obligations secured by liens on the property.  (*See* Dkt. No. 12, Ex. 1 ¶ 4).[5] However, the Hold Harmless Agreement went well beyond that.  That agreement required that plaintiff "indemnify and hold harmless [LoanCare] . . . from and against any actual or threatened action, suit or proceeding and against any and all claims, expenses, losses or damages (including reasonable attorney's fees) arising out of or as a result of an actual and/or alleged breach of the repair contract with [contractor name]."  (Am. Compl., Ex. N).

Because it is certainly plausible that the scope of the Hold Harmless Agreement exceeds the requirements of the contract, the complaint sufficiently pleads that defendants' failure to disburse insurance proceeds based on plaintiff's refusal to sign that agreement was a breach of contract.[6]  The complaint also sufficiently pleads that plaintiff would have likely sustained damages as a result of that breach, as he did not receive the remaining funds for another year and a half after his initial request.

Accordingly, the amended complaint sufficiently pleads facts to support a breach of contract claim and this Court will deny defendants' motion to dismiss pursuant to Count 1.

---

[5] "Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower:  (a) agree in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender. . . .

If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien.  Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4."

[6] Furthermore, at the time that plaintiff was requesting disbursement of the remaining funds, the house was complete and plaintiff would have likely been entitled to payment per the terms of the contract.

B.     **Count 2:  Agency**

Count 2 purports to allege a claim against defendant Lakeview on a theory of agency. Under Massachusetts law, a principal may be held directly liable for the actions of its agent toward third parties "if the agent was acting with the actual or apparent authority of the principal in that transaction."  *Theos & Sons, Inc. v. Mack Trucks, Inc.*, 431 Mass. 736, 743 (2000) (citing Restatement (Second) of Agency §§ 7, 8 (1958)).  "An agency relationship is created when there is mutual consent, express or implied, that the agent is to act on behalf and for the benefit of the principal, and subject to the principal's control."  *Id*. at 742.  "The essence of the principal-agent relationship is the right of power or control by the alleged principal over the conduct of the alleged agent."  *Commonwealth Aluminum Corp. v. Baldwin Corp.*, 980 F. Supp. 598, 611 (D. Mass. 1997).

Although an agency relationship may be formed by express consent of the parties, it need not be.  Rather, an agency relationship may also be implied from "conduct by the principal which causes a third person reasonably to believe that a particular person has authority to enter into negotiations or to make representations as his agent."  *DeVaux v. American Home Assurance Co.*, 387 Mass. 814, 819 (1983) (internal quotations and citations omitted); *see also Hudson v. Massachusetts Property Insurance Underwriting Ass'n*, 386 Mass. 450, 457 (1982).  Importantly, an implied agency relationship can only be formed because of "some direct intervention by the principal."  *Commonwealth Aluminum Corp.*, 980 F. Supp. at 611.  It is not enough for the agent to make representations to a third party in the absence of the principal.

Lakeview, the principal here, informed the plaintiff that the insurance funds would be transferred to LoanCare and that he should contact LoanCare because "they would be the Company who would be involved in releasing the funds and having inspections of work completed." (Am. Compl. ¶¶ 11, 63).  Such conduct by Lakeview could reasonably cause a third

person to believe that LoanCare has the authority to act on behalf of Lakeview concerning the disbursements of the insurance proceeds. For that reason, an agency relationship may be implied from Lakeview's conduct.

The mere existence of an agency relationship, however, is not a breach of contract or a tort. And Count 2 does not actually allege that Lakeview should be responsible as a principal for any breach of contract or other misconduct of LoanCare. Nonetheless, that is the obvious import of the allegations. The Court will therefore construe the allegations of Count 2 to allege a claim against Lakeview, as principal, for any breach of contract or other misconduct of its agent, LoanCare. Accordingly, the motion to dismiss will be denied as to Count 2.

### C.     Count 3:  Breach of Implied Covenant of Good Faith and Fair Dealing

Under Massachusetts law, a covenant of good faith and fair dealing is implied in every contract. *See UNO Rests., Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004). That covenant provides that "neither party shall do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract." *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 471-72 (1991) (quoting *Drucker v. Roland Wm. Jutras Assocs.*, 370 Mass. 383, 385 (1976)). By contracting, parties implicitly agree "to deal honestly and in good faith in both the performance and enforcement of the terms of their contract." *Hawthorne's, Inc. v. Warrenton Realty, Inc.*, 414 Mass. 200, 211 (1993). To establish a breach of the implied covenant, "a plaintiff must prove that there existed an enforceable contract between the two parties and that the defendant did something that had the effect of destroying or injuring the right of [the plaintiff] to receive the fruits of the contract." *FabriClear, LLC v. Harvest Direct, LLC*, 481 F. Supp. 27, 35 (D. Mass. Aug. 24, 2020) (quoting *Blake v. Professional Coin Grading Serv.*, 898 F. Supp. 2d 365, 388 (D. Mass. 2012)).

As discussed, there appears to have been a valid mortgage contract between LoanCare

and plaintiff that governed the disbursement of insurance proceeds. And although that contract permitted LoanCare to require that plaintiff agree in writing to the payment of liens on the property, it is plausible that requiring plaintiff to sign LoanCare's Hold Harmless Agreement in order to receive the remaining insurance funds was outside of the scope of the contract. By withholding the disbursement of funds for a year and half because of plaintiff's refusal to sign such an agreement, the amended complaint sufficiently pleads that LoanCare's conduct "had the effect of destroying or injuring the right of [plaintiff] to receive the fruits of the contract." Thus, the amended complaint sufficiently pleads facts to establish a breach of the covenant of good faith and fair dealing

Accordingly, the motion to dismiss will be denied as to Count 3.

### D.   Count 4:  Conversion

Plaintiff has voluntarily withdrawn his conversion claim in Count 4. (*See* Dkt. No. 13, Pl. Opp. at 10). Defendants do not object to plaintiff's dismissal of his conversion claim. (*See* Dkt. No. 16, Def. Reply at 4).

Accordingly, the motion to dismiss will be granted as to Count 4.

### E.   Count 5:  Fraudulent Misrepresentation

Plaintiff has voluntarily withdrawn his fraudulent misrepresentation claim in Count 5. (*See* Dkt. No. 13, Pl. Opp. at 10). Defendants do not object to plaintiff's dismissal of his fraudulent misrepresentation claim. (*See* Dkt. No. 16, Def. Reply at 4).

Accordingly, the motion to dismiss will be granted as to Count 5.[7]

---

[7] In plaintiff's opposition to defendants' motion, they requested that this Court convert the fraudulent misrepresentation claim to a negligent misrepresentation claim. *See* Dkt. No. 13 at 10 ("Plaintiff is requesting to amend his complaint pursuant to Fed. R. Civ. P. 9(b) and bring a claim for negligent misrepresentation. . . ."). An opposition to a motion to dismiss is not, however, a proper vehicle by which a plaintiff may seek to amend a complaint.

### F. Count 6: Mass. Gen. Laws ch. 93A

"A mere breach of contract does not constitute an unfair or deceptive trade practice under 93A, unless it rises to the level of 'commercial extortion' or a similar degree of culpable conduct." *Com. Union Ins. Co. v. Seven Provinces Ins*. Co., 217 F.3d 33, 40 (1st Cir. 2000) (citing *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451 (1991)). For example, the First Circuit upheld a finding that a defendant violated Chapter 93A by withholding money that it legally owed under the contract at issue, because it used the money owed as a form extortion— "in order to enhance [defendant's] bargaining power." *See Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 18 (1st Cir. 1985). Similarly, the court upheld a finding that a defendant violated Chapter 93A by withholding payment and "stringing out the process" with the intent to "force [the plaintiff] into an unfavorable settlement." *See Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47, 55-56 (1998).

Here, the plaintiff alleges that LoanCare refused to release the remaining funds to which he was entitled unless he signed the Hold Harmless Agreement, releasing LoanCare of any potential liability. (Am. Compl. ¶¶ 42-45; *see also* Am. Compl. at Intro ("He was told that LoanCare would not release the funds unless the Plaintiff released LoanCare from any and all liability, the plaintiff refused to do so."). The complaint thus alleges facts that go beyond a "mere breach of contract"—it alleges that LoanCare was withholding funds owed to Michel, under the contract, in order to induce him to sign the Hold Harmless Agreement. Such allegations sufficiently plead a Chapter 93A claim. *See Frank J. Linhares Co. v. Reliance Ins. Co.*, 4 Mass. App. Ct. 617, 622 (1976) (holding that allegations that a company refusing to deliver a truck, to which plaintiff had a right of possession, unless plaintiff agreed to sign a release sufficiently met the pleading requirements of Chapter 93A).

Accordingly, the motion to dismiss will be denied as to the claim asserted under Chapter

93A.

## IV. Conclusion

For the foregoing reasons, defendants' motion to dismiss as to Counts 1, 2, 3, and 6 is DENIED.  Defendants' motion to dismiss as to Counts 4 and 5 is GRANTED.

**So Ordered.**

                                                     F. Dennis Saylor IV
                                                   F. Dennis Saylor IV

Dated: February 7, 2022                    Chief Judge, United States District Court